**Haroutune MEKHJIAN and Shake Mekhjian, Plaintiffs,**

v.

**Lonnie E. WOLLIN, Wollin Associates, Inc., Lonnie E. Wollin, P.C., Garlon Equities Corp., Berg Harmon Associates, f/k/a Harmon/Envicon Associates, Harmon American Securities Company, L.P., f/k/a Berg Harmon Securities Company, Robert T. Harmon, Charles N. Loccisano, Southern Ventures, Inc., f/k/a Berg Ventures, Inc., Primerica Corporation, Kenneth Leventhal & Company, and First Fidelity Bank, N.A., Defendants.**

**No. 90 Civ. 2691 (WCC).**

United States District Court, S.D. New York.

Jan. 15, 1992.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for plaintiffs; Robert L. Sills, Janet E. Mattick, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Primerica Corp.; William P. Frank, Richard S. Simon, Steven Kronengold, Peretz Bronstein, of counsel.

Solinger Grosz & Goldwasser, P.C., New York City, for defendant Kenneth Leventhal & Co.; John C. Grosz, Dan L. Goldwasser, Stacy M. Leopold, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This is an action for actual and punitive damages and equitable relief arising out of plaintiffs' investments in securities of Polo Club Apartments Associates Limited Partnership ("Polo Club") and other securities

issued, underwritten or promoted by defendants.

The following motions are currently before the Court: Motions by Kenneth Leventhal & Co. ("Leventhal") to dismiss the Second and Fifth Claims of the Amended Complaint, for securities fraud and common-law fraud; to dismiss the Seventh Claim, for negligent misrepresentation; and to dismiss the Third Claim, for aiding and abetting violations of the Investment Advisors Act of 1940 ("the Advisors Act"). Also before the Court is the motion of Leventhal, joined by all defendants, to dismiss the securities fraud claim as time-barred; the motion of Leventhal and Primerica Corp. ("Primerica") to dismiss the First Claim, under the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), for failure to state a claim and for failure to meet the specificity requirements of Rule 9(b), Fed.R.Civ.P.; and Leventhal's motion for Rule 11 sanctions.

## BACKGROUND

Plaintiffs Haroutune Mekhjian and his wife Shake Mekhjian ("the Mekhjians") are residents of New Jersey who since 1980 have made numerous large investments in various real estate limited partnerships including Polo Club. In October 1980, the Mekhjians retained Wollin Associates and Lonnie E. Wollin as their investment, tax, and financial advisers, and for accounting and legal advice with respect to their investments, paying a regular monthly fee of approximately $1200. Am.Cmplt. ¶ 17.

In 1982, the Mekhjians discussed with Wollin their desire to invest in real estate, with the goal of receiving current income from such an investment and appreciation in the value of the property. Am.Cmplt. ¶ 19.

Defendant Berg Harmon, and its predecessors and affiliates, have been in the business of purchasing and managing real estate and syndicating, promoting and selling securities in real estate ventures since the 1970's. Since 1980, Berg Harmon has offered more than fifty real estate limited partnerships to the public, and raised hundreds of millions of dollars. Am.Cmplt. ¶ 20.

Plaintiffs allege that sometime in 1984, Wollin entered into an agreement with Berg Harmon whereby Berg Harmon agreed to pay Wollin its standard sales commission for all sales of Berg Harmon securities effected by him. Am.Cmplt. ¶ 22.

In August 1984, on Wollin's advice, the Mekhjians invested $375,000 in a real estate limited partnership known as Pine Hollow Associates, Ltd. ("Pine Hollow") and in October, 1984, they invested $375,000 in a real estate limited partnership known as The Breakers Apartments, Ltd. ("The Breakers"), both organized and sponsored by Berg Harmon. Am.Cmplt. ¶ 21. Plaintiffs allege that neither Wollin nor Berg Harmon told the Mekhjians that Berg Harmon had agreed to pay Wollin its standard commissions for selling Berg Harmon securities before Wollin began recommending these investments. Am.Cmplt. ¶ 26.

Sometime between May and September 1985, Wollin recommended that the Mekhjians invest in securities of another Berg Harmon real estate limited partnership, Polo Club, which owned and operated a residential apartment complex near Atlanta, Georgia (the "Property"). Although Polo Club was originally intended to be syndicated in units to a number of investors, Wollin advised the Mekhjians to purchase the entire limited partnership interest and the offering was restructured accordingly. Am.Cmplt. ¶ 44.

In mid-September, 1985, after visiting the Property, the Mekhjians agreed to purchase the entire limited partnership for a total of $5,000,000, with an initial cash payment of $750,000 and the delivery of an interest-bearing note in the amount of $4,250,000 (the "note"). Am.Cmplt. ¶ 49. While the original subscription agreement, note and other documents were signed sometime in September, 1985, it was understood by all parties that the purchase was not then final. After the execution of the original subscription agreement, Wollin was holding the Mekhjians' initial payment and the documents executed in September

pending their decision to proceed. Am. Cmplt. ¶ 51.

By October, 1985, the Mekhjians were expressing serious doubts about the wisdom of the Polo Club investment. Plaintiffs allege that Wollin gave them repeated assurances as to the soundness of the investment and encouraged them to proceed with the deal. When the Mekhjians continued to express doubts, Wollin assured them by referring to a forecast of operating results for Polo Club allegedly reviewed and issued by defendant Leventhal in October, 1985. The forecast and accompanying report allegedly validated the underlying assumptions of previous forecasts and reports, notwithstanding a plethora of untrue or misleading statements that plaintiffs claim are contained in the earlier forecasts and reports. Am. Cmplt. ¶ 57. Wollin mailed a copy of the forecast to the plaintiffs. Am.Cmplt. ¶¶ 58, 64, 65.

Plaintiffs contend that Wollin and executives of Berg Harmon persuaded the Mekhjians to consummate the deal based on, among other misleading claims, the assertion that Polo Club was financially sound. Plaintiffs also allege that sometime between December 17, 1985 and March 6, 1986, after the deal was finally consummated, the terms upon which the Mekhjians were to invest were altered. Specifically, plaintiffs allege that a non-interest bearing note in the principal amount of $5,449,-828.85 was executed and "substituted" for the original interest-bearing note in the principle amount of $4,250,000. Am.Cmplt. ¶ 72. Although the aggregate payments under the two notes were equal, plaintiffs allege that the Second Note was substantially less favorable to the Mekhjians in the event of prepayment or default by them or bankruptcy by Polo Club.

Plaintiffs also allege that at regular intervals from the closing of the deal until the collapse, Berg Harmon mailed the Mekhjians a regular series of "updates," all falsely reporting that Polo Club was fiscally sound.

Lastly, plaintiffs claim that Primerica is also responsible for the alleged misdeeds of Berg Harmon because Primerica assertedly had the power to elect or appoint directors and officers to Berg Ventures and actually exercised general supervision and control over the business of Berg Harmon. Am. Cmplt. ¶ 90.

## DISCUSSION

### I. Applicable Legal Standard

■ In considering a motion to dismiss for failure to state a claim, the court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In order to prevail on a motion to dismiss, the moving party must demonstrate "beyond doubt that the [non-moving party] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A court must accept as true the factual allegations accompanying the complaint and draw all reasonable inferences in favor of the non-moving party. *See Cosmas v. Hassett*, 886 F.2d 8, 12 (2d Cir.1989).

### II. Statute of Limitations Under Rule 10b–5

■ All defendants have joined in the motion to dismiss plaintiffs' 10b(5) claims as time-barred. Since the motion was originally briefed, the law has both evolved and regressed. The Supreme Court recently decided that the limitations period applicable to implied private claims under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder is the one-and-three-year structure applicable to express causes of action under the Exchange Act. *Lampf, Pleva, Lipkind, Pru-*

*pis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Thus, the Court held that "litigations instituted pursuant to § 10(b) and Rule 10b–5 therefore must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *See id.,* 111 S.Ct. at 2782. Significantly, the Supreme Court applied its holding retroactively in *Lampf,* thereby making the plaintiff-respondents' lawsuit untimely. *See id.* at 2782.

Recent action by the Congress, however, has made *Lampf*'s holding, insofar as it concerns the limitations period under Section 10(b), inapplicable to the instant case. Section 27A(a) of the Exchange Act, just enacted by Congress, provides that:

The limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.[1]

Thus, Congress has effectively turned back the clock on actions, such as the instant case, which were pending prior to the time the Supreme Court decided *Lampf.*

As both sides here concede, the limitations period of the District of New Jersey is the one that would have applied prior to *Lampf.* Specifically, the parties here agree that the applicable limitations period is the one announced in *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). The statute of limitations announced in *Data Access,* like that of *Lampf,* provides that lawsuits must be brought within one year after discovery of the fraud but in no event more than three years after the alleged violation.

While agreeing on the applicability of *Data Access,* the parties forcefully disagree on the question of the applicability of federal accrual and tolling rules to the

*Data Access* period. Plaintiffs argue correctly that the adoption of a state limitations period does not preclude the imposition of federal tolling. *See, e.g., Welch v. Cadre Capital,* 923 F.2d 989 (2d Cir.1991); *Kirschner v. Cable/Tel Corp.,* 576 F.Supp. 234 (E.D.Pa.1983). Plaintiffs further contend, in essence, that it is of no significance that the period at issue here is not a state period at all but rather the federal limitations period set forth in the Exchange Act itself.

With respect to this point, the Court cannot agree. As defendants note, *Data Access* explicitly held that the federal scheme of limitations set forth in the 1933 and 1934 securities acts constitutes the proper period of limitations for a complaint alleging violations of Section 10(b) and Rule 10b–5. *See* 843 F.2d at 1550. In the 1933 and 1934 securities acts, Congress expressly provided that lawsuits be brought "[i]n no event ... more than three years after sale." 15 U.S.C. § 77m. That this language means what it says has been confirmed repeatedly. In *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990), for example, the Seventh Circuit addressed the precise question at issue here, holding that equitable estoppel is not available to extend the three-year repose period that applies in 10b–5 cases. The court reasoned that tolling is absolutely limited to the potential "two-year grace period" which is in effect created by the statute's one-and-three-year structure, a structure which provides a definitive cutoff point at three years. The court concluded that "[u]nless the 'in no event more than three' language cuts off claims of tolling and estoppel at three years ... it serves no purpose at all." 908 F.2d at 1391.

In the Third Circuit, district courts interpreting *Data Access* have reached the same results as *Belleville Shoe.* Thus in *Adelaar v. Lauxmont Farms,* 695 F.Supp. 821, 822–23 (M.D.Pa.1988), the court held that in *Data Access* "the Third Circuit made clear that the three-year period was an absolute

---

1. Section 27A was passed by the Congress on November 27, 1991, as § 476 of the Comprehensive Deposit Insurance Reform and Taxpayer Protection Act of 1991, Pub.L. No. 102–242, and was signed into law by the President on December 19, 1991.

limit ... which was not subject to any equitable tolling doctrine suspending the running of the statute during the time a plaintiff could not have reasonably known about violations." *See also Carson v. Bazilian,* 1990 WL 158648 (E.D.Pa. Oct. 15, 1990).

This Court also notes a recent decision in the Tenth Circuit that refuses to apply equitable principles to extend the statute of repose in the securities context.[2] In *Anixter v. Home–Stake Prod. Co.,* 939 F.2d 1420 (10th Cir.1991), the Tenth Circuit applied the statutory one-and-three-year rule of section 13 of the Securities Act of 1933 to plaintiffs' 1933 Act claims as well as to plaintiffs' Rule 10b–5 claims. In so doing, the appellate court overturned the lower court's holding, which was based on the jury's findings, that defendants were equitably estopped from raising the statute of limitations defense. After detailed analysis of the relevant congressional history, the appellate court concluded:

> [W]e believe the more accurate analysis [of Section 13] excludes the application of [equitable estoppel] when the consequence operates to trump a clear outer limit intended by Congress. "Unless the 'in no event more than three' language cuts off claims of tolling and estoppel at three years, however, it serves no purpose at all—what other function could be served by such language in a statute that starts the time on discovery?" We therefore conclude that the doctrine of equitable estoppel is not available to avoid the statute of repose established by Section 13.

*Anixter,* 939 F.2d at 1436 (quoting *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1391). Once it had decided the pivotal issue as to Section 13, the Tenth Circuit had little difficulty deciding that the same reasoning applied to the court-imposed limitation for Rule 10b–5 actions: "based on our

prior discussion of Section 13 to plaintiffs' express causes of action, we hold that plaintiffs' Section 10(b) and Rule 10b–5 claims are untimely and must be dismissed." *Id.* at 1441.

Here, as in the caselaw cited above, the Court finds that the three-year period of repose acts as an absolute bar to plaintiff's Section 10(b) claims. The violation of Section 10(b) of which plaintiff complains occurred in September of 1985. Accordingly, plaintiff was required to commence an action on or before September of 1988, three years after the occurrence of the conduct alleged to have violated the statute. Since plaintiff's original complaint was filed in 1990, the Mekhjians' Section 10(b) claim must now be dismissed.

### III. RICO Claims

#### A. *Leventhal's Motion to Dismiss*

■ The Amended Complaint includes a RICO claim against Leventhal; Leventhal has advanced a number of challenges against the sufficiency of plaintiffs' RICO claim, charging, *inter alia,* that plaintiffs' RICO claim fails for lack of participation in the conduct of an enterprise, lack of two predicate acts, lack of continuity, lack of timeliness and lack of reliance and scienter. The Court agrees with Leventhal's position with regard to the first of these arguments and therefore does not reach Leventhal's remaining arguments.

Leventhal's argument that it did not participate in the conduct of the alleged Berg Harmon enterprise is grounded in RICO Section 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of

---

2. Section 27A(a) of the Exchange Act, which provides that the limitations period in the instant case shall be determined in accordance with the laws of the applicable jurisdiction as they existed on June 19, 1991, is not a bar to this Court's consideration of *Anixter.* Although *Anixter* was decided after June 19, 1991, this Court considers the opinion only in the context of equitable tolling, not in its determination of the limitations period, which is clearly the one-and-three-year structure announced in *Data Access.* In any case, the Court does not rest its opinion on *Anixter.*

racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). (emphasis added). Leventhal correctly notes that in this District, courts have held that the "conduct or participate" requirement is not satisfied where the fraud accusation against an accounting firm arises out of its performance of traditional accounting functions. *See Griffin v. McNiff,* 744 F.Supp. 1237, 1255 n. 18 (S.D.N.Y.1990); *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 261–62 (S.D.N.Y.1989); *Plains/Anadarko–P Ltd. Partnership v. Coopers & Lybrand,* 658 F.Supp. 238 (S.D.N.Y.1987).

In *Plains/Anadarko–P,* the first in this line of cases, Judge Pollack granted the defendant accounting firm's 12(b)(6) motion as to the plaintiff's RICO claim, noting:

> The federal statutory requirement that an enterprise be *conducted* by the accused accountants is not satisfied when a professional accountant enters an engagement of finite duration and scope, undertaken for a particular client …

658 F.Supp. at 240 (emphasis in original). Earlier in the opinion, Judge Pollack remarked:

> The claim attempts to squeeze an independent professional auditing engagement into the ferment of the RICO statutes, but it requires more than loose adjectives and characterizations to connect activities of an independent professional auditor with frauds committed by the enterprise being audited.

*Id.*

Plaintiffs attempt to distinguish the *Plains/Anadarko–P* line of cases, claiming that in each of the three cases the accountants dismissed from the RICO claims were charged with nothing more than mere negligence in the performance of their duties. This is clearly a mischaracterization. In each of the three cases, the accounting firm defendants were accused of fraud and racketeering as well as negligence. *See Griffin,* 744 F.Supp. at 1251; *Goldman,* 706 F.Supp. at 258; *Plains/Anadarko–P,* 658 F.Supp. at 239.

Moreover, it appears that the nature of the accountants' involvement in the alleged enterprises in *Plains/Anadarko–P* and *Goldman* was more substantial than Leventhal's involvement here. In *Plains/Anadarko–P,* for example, defendant Coopers & Lybrand was apparently involved in one or more substantial audits for plaintiffs. *See* 658 F.Supp. at 239. In *Goldman,* moreover, defendant Oppenheim, Appel, Dixon & Co. ("OAD") was the regular accounting firm for the defendant partnership that was sold to plaintiffs. In this capacity, OAD conducted numerous audits of the defendant partnership and submitted various financial reports directly to the plaintiffs over a four-year period. *See Goldman v. McMahan, Brafman, Morgan & Co.,* No. 85 Civ. 2236, 1987 WL 12820 (S.D.N.Y. June 18, 1987) (previous opinion in same case).

If this extensive, continuing activity could not be viewed as participation in the control of an enterprise, it strains reasoning to find such participation on the part of Leventhal in the instant case. Here, Leventhal did little more than conduct a limited, non-audit review of Berg Harmon's financial forecast for the Polo Club investment. Plaintiffs labor to establish Leventhal as one of a "stable" of accounting firms working for Berg Harmon by reference to one other investment, not involving the Mekhjians, that Leventhal may have reviewed. Even if Leventhal was one of a number of firms that provided opinions as to the financial projections utilized by Berg Harmon in selling its limited partnerships, this is far from the level of involvement needed to establish Leventhal as participating in the control of Berg Harmon's enterprise. Accordingly, plaintiffs' RICO claim against Leventhal is dismissed.

### B. *Primerica's Motion to Dismiss*

■ The Amended Complaint also includes a RICO claim against Primerica. Plaintiffs allege both controlling person liability and direct liability on the part of Primerica for the acts of Berg Harmon Associates. Strenuously disputing the RICO claim, Primerica argues that the allegations against it are far too vague and insubstantial to support the claim. Specifically, Primerica notes that the Amended

Complaint includes only one paragraph relevant to the RICO claim against it, and that this paragraph contains little more than the bare allegation that Primerica "exercised general supervision and control over the business of Berg Harmon." Am. Cmplt. ¶ 90.

This Court has previously held that in order to connect a controlling person with a RICO claim, a plaintiff must establish facts that show criminal liability on the part of the controlling person for the controlled person's acts, because section 1961 defines acts to be racketeering only if they are among the enumerated felonies punishable under the laws of the United States. *See Frota v. Prudential–Bache Sec., Inc.*, 639 F.Supp. 1186, 1192 (S.D.N.Y.1986); *Levine v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 639 F.Supp. 1391, 1396 (S.D.N.Y. 1986). "In order for a controlling person to be held criminally liable under [section 20 of the 1934 Act], it must be shown that the controlling person knowingly used the controlled person to commit the illegal act."

Plaintiffs attempt to distinguish *Frota* and *Levine* by asserting that "the Mekhjians do not argue that the knowledge of Berg Harmon is to be imputed to Primerica on the basis of its status, but rather that Primerica actually exercised management control over the conduct of the Berg Harmon enterprise." But even if plaintiffs are correct in their assertion that Primerica was the manager of the day-to-day operations of Berg Harmon, this would not neutralize *Frota* and *Levine*. Here, as in those cases, "there is no allegation that [the controlling party] played any part in the alleged misdeeds" or had any knowing involvement in the purported fraud. *Levine*, 639 F.Supp. at 1395. Having failed to allege that Primerica itself committed any of the requisite predicate acts or acted with the requisite criminal intent, plaintiffs cannot maintain their RICO claim as against Primerica. Accordingly, the RICO claim as against Primerica is dismissed.

## IV. Aiding and Abetting under the Investment Advisors Act

▪ Leventhal has moved to dismiss plaintiffs' claim against it for aiding and abetting under the Investment Advisors Act, 15 U.S.C. §§ 80b–6, 80b–15. Essentially, plaintiffs claim Leventhal aided and abetted Wollin, the Mekhjians' investment advisor, in allegedly obtaining some $425,000 in undisclosed commissions from Berg Harmon by failing to note the false and misleading nature of a footnote to a forecast it reviewed. Defendant correctly notes, however, that the applicable caselaw renders plaintiffs' claim untenable.

In *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court held that "there exists a limited private remedy under the Investment Advisors Act of 1940 to void an investment advisors contract, but that the Act confers no other private causes of action, legal or equitable." *Id.* at 24, 100 S.Ct. at 249. Leventhal maintains that this narrow interpretation of the Act is enough to preclude plaintiffs' claim here, citing *Wellington International Commerce Corp. v. Retelny*, 727 F.Supp. 843 (S.D.N.Y.1989) as additional support for its view. In *Wellington*, Judge Sand, relying on the Supreme Court's decision in *Transamerica*, dismissed plaintiff's claim for aiding and abetting a violation of the Investment Advisors Act. In reaching his decision, Judge Sand noted that "it is clear from the Supreme Court's opinion in *Transamerica* that the Investment Advisors Act only provides a private cause of action for rescission of the contract and recovery of consideration paid.... The traditional contract remedy of rescission does not include a tort claim against other entities who are not parties to the contract." *Id.* at 845–46. Judge Sand went on to explain that even if the defendant investment bank had aided and abetted the defendant investment advisor, no recovery could be had against the investment bank because none of the recoverable consideration was paid to the investment bank. *Id.* at 846. Here, as in *Wellington*, the Court finds that plaintiffs have no private remedy for aiding and abetting under the Investment Advisors Act. None of the claimed illegal commissions are alleged to have

been paid to Leventhal and plaintiffs do not allege that Leventhal was itself acting as an advisor.

## V. Rule 11 Sanctions

Concurrent with its motion to dismiss, Leventhal has also moved this Court to impose Rule 11 sanctions on the plaintiffs. The Court denies this motion because it does not appear that the pleadings have been interposed for any improper purpose. *See O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 705–06 (2d Cir.1990).

## VI. Pendent Jurisdiction over Remaining Common–Law Claims

Because all of the federal claims as against Primerica and Leventhal are dismissed pursuant to the discussion above, the remaining common-law claims against Primerica and Leventhal are also dismissed pursuant to this Court's discretion under the doctrine of pendent jurisdiction. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 756–57 (2d Cir. 1986); *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 263 (S.D.N.Y.1989); *Goodman v. Shearson Lehman Bros. Inc.*, 698 F.Supp. 1078, 1087 (S.D.N.Y.1988); *Roebuck v. Guttman*, 678 F.Supp. 68, 69 (S.D.N.Y.1988).

### Conclusion

For the reasons stated, plaintiffs' securities fraud claim is time-barred and is thus dismissed as against all defendants. The motion by Leventhal and Primerica to dismiss the RICO claims against them is granted as is Leventhal's motion to dismiss the claim against it for aiding and abetting violations of the Investment Advisors Act of 1940. Leventhal's motion for Rule 11 sanctions is denied. The remaining common-law claims as against Leventhal and Primerica are dismissed without prejudice.

SO ORDERED.