**ASTOR CHAUFFEURED LIMOUSINE COMPANY,**
Plaintiff–Appellant–Cross–Appellee,

v.

**RUNNFELDT INVESTMENT CORPORATION, et al.,**
Defendants–Appellees–Cross–Appellants.

Nos. 89–1631, 89–1654.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1990.

Decided Aug. 24, 1990.

---

**1542**

Michael H. Moirano, Nisen & Elliott, Shelly B. Kulwin, Chicago, Ill., for plaintiff-appellant-cross-appellee.

Gary M. Elden, George R. Dougherty, Philip C. Stahl, Grippo & Elden, Chicago, Ill., for defendants-appellees-cross-appellants.

Before POSNER and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Limousine companies, like many law firms, flourish to the extent they have stable lists of corporate clients. Walk-in business is not enough to keep a firm solvent. Centennial Custom Limousine Service, which offered limousine service in Chicago, experienced the problem first hand. Two years of negative profits convinced its par-

ent, Runnfeldt Investment Corporation, that new clients had to be obtained immediately.

Runnfeldt's principal investors, Elmer A. Goodman and David Schoenberg, hired James Malchin, the dispatcher at Chicago Limousine Company. Centennial promised Malchin an equity interest in exchange for producing clients. Malchin moved, and clients came with him. Despite this boost, Centennial remained unprofitable, and its owners were reluctant to give Malchin the promised shares. While continuing to work as Centennial's dispatcher, Malchin set up his own business leasing drivers to corporations that supplied their own limousines (the "drivers' program"), in competition with Centennial. He remained disgruntled. After another year of losses Schoenberg and Goodman decided that the limo business was not for them. Representations they made in the course of selling Centennial produced this securities suit.

Astor Chauffeured Limousine Company, a substantially larger firm, was expanding aggressively. Astor sought to buy smaller firms, keep the clients, and improve efficiency by consolidating administration and dispatch. In April 1985 Runnfeldt's principals met Michael Zaransky, Astor's president, at a party given by Altheimer & Gray, the law firm of which Schoenberg was a partner. Altheimer & Gray had supplied legal advice to Zaransky's businesses. Goodman, Schoenberg, and Zaransky discussed a possible sale of Centennial to Astor.

Astor wanted to buy the client list by itself, but Runnfeldt demurred. After two months of discussions the parties met at the offices of Altheimer & Gray on June 19, 1985, to hammer out a deal. Astor inquired about the reliability of the clients and "who controlled them". Goodman and Schoenberg responded that "they controlled the clients and that they would stay". That was the assurance Astor needed. (Defendants deny making such statements, but we recite the facts as the jury apparently found them.) To back up the promises, Goodman and Schoenberg made covenants not to compete in the limousine business. The parties also discussed Malchin's fate. Schoenberg sought a promise that Malchin wouldn't be "pruned". Astor thought Malchin was deadwood (the point of Astor's acquisition program was to obtain a larger clientele to be handled by its existing administrative apparatus) and asked whether keeping Malchin was a condition of the deal. Goodman and Schoenberg decided to leave Malchin to his own devices: Goodman said to Zaransky, "If you don't need him, fuck him." On July 24 Astor purchased Centennial's stock for $192,057.70. Astor also bought Centennial's limousines for $85,590.45 from a partnership that had leased them to Centennial.

Malchin did not appreciate this turn of events. Within two months he was gone, and his clients went with him. Centennial's business dropped off precipitously. Astor did not obtain the business that was the motivation for the deal. Centennial (at Astor's behest) sued Malchin in state court, charging that he had breached his fiduciary duties to the firm. Malchin responded that the clients were his, that Centennial had broken its promise of an ownership interest, and that Centennial had authorized him to run the drivers' program as a stopgap until it came through with the promised equity stake. Centennial ultimately obtained a judgment of nearly $500,000 against Malchin; the record does not reveal whether this judgment has been satisfied.

In January 1987 Astor filed this suit against Runnfeldt, Goodman, Schoenberg, their partnership, and Ronald S. Simon (collectively "Runnfeldt"), seeking relief under § 12 of the Securities Act of 1933, 15 U.S.C. § 77l, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the SEC's Rule 10b-5, 17 C.F.R. § 240.10b-5, and the common law of Illinois. Astor claimed that Runnfeldt misled it in three ways: (1) lying about who controlled the clients; (2) failing to disclose the drivers' program; and (3) failing to reveal that Centennial had promised Malchin an ownership interest. Astor sought $525,270 in compensatory damages.

The jury found Runnfeldt liable. It awarded Astor $300,000 under § 10(b),

$193,466 under § 12(2), $6,534 on the common law count, and threw in $25,000 in punitive damages, for what it must have thought was a total of $525,000. Both sides challenged the verdict. Astor asked the district judge to vindicate the jury's "true intent" by entering a judgment of $525,000, rather than the $300,000 that was the highest award on any one count. Runnfeldt sought a new trial or a judgment notwithstanding the verdict. The district judge refused to overturn the verdict but reduced the judgment to $225,000. Both sides appeal.

## I

■ First comes a question about appellate jurisdiction. Astor purchased Centennial through its subsidiary, Limousines, Inc. Both Astor and Limousines were plaintiffs. Before trial, the district judge dismissed Astor, reasoning that it lacked standing because its injury is derivative from Limousines. See *Kagan v. Edison Brothers Stores, Inc.*, 907 F.2d 690 (7th Cir.1990). Yet the notice of appeal names Astor as the appellant, not mentioning Limousines. Runnfeldt maintains that we therefore lack jurisdiction. See *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988).

Shortly after the district judge dismissed Astor, however, he apparently reversed field, stating in open court that Astor rather than Limousines is the proper plaintiff. Although the judge did not memorialize the decision in a written order, both the parties and the judge conducted the trial as though Astor were the sole plaintiff. The final judgment bears its (and not Limousines') name. Because Astor is the party named in the judgment, it is entitled to file an appeal.

## II

Although the claims under the federal securities laws have many things in common with the claims under state law, we separate them for purposes of exposition. We briefly discuss § 12(2) and then take up all questions under Rule 10b–5. Part III covers state law to the extent it presents distinct issues. Part IV deals with damages.

## A

■ Runnfeldt contends that no award under § 12(2) is possible, because the statute of limitations in § 13 of the '33 Act, 15 U.S.C. § 77m, gave Astor only one year from the date it discovered the fraud. The sale closed in July 1985. Malchin left in September. Centennial (under Astor's control) sued Malchin in state court almost immediately. In November Malchin filed his answer, contending that he owned the customers, that he had been promised an ownership interest in Centennial, and that Centennial had authorized the drivers' program. Astor did not file the federal suit until January 1987, more than a year later.

Malchin's answer, if true, revealed what Runnfeldt hid. Astor was on notice. Although Astor insists that it was not required to *believe* Malchin, this statute of limitations starts to run when the party knows enough to call for inquiry. *Norris v. Wirtz*, 818 F.2d 1329, 1334 (7th Cir.1987). Malchin's departure and the immediate decline of business in September 1985 should have induced Astor to look into whether it had been told the truth about who controlled the customers. By November 1985 Astor had been told point blank that Malchin viewed the customers as his property. Suit more than a year later is untimely under § 13. The claim under § 12(2) should have been dismissed.

■ After this case was argued, we held that § 13 also supplies the statute of limitations in suits under § 10(b) and Rule 10b–5. *Short v. Belleville Shoe Manufacturing Co.*, 908 F.2d 1385 (7th Cir.1990). Before *Short*, this court had borrowed the statutes of limitations from state blue-sky laws, a period that in Illinois is three years. See *Davenport v. A.C. Davenport & Son Co.*, 903 F.2d 1139 (7th Cir.1990). We reserved in *Short* the question whether § 13 would be applied retroactively, 908 F.2d at 1390, and we do not answer that question today. Runnfeldt has never challenged the timeliness of the claims under § 10(b) and Rule

10b–5, so Astor has not been required to show that it relied on the three-year period. It would be inappropriate to apply § 13 retroactively when the defendant has been silent.

■ Silent about the statute, that is. Runnfeldt insists that the securities claims are untimely because ¶ 8 of the contract provides that the 'purchaser may not file suit unless it serves notice within 180 days of the date of signing. This clause is inapplicable, for it applies only to "an action for breach of a representation and warranty set forth in paragraph 6 (other than for a breach of paragraph ... 6(a)(xiv))". Astor's principal argument is that Runnfeldt's pre-contract representations—statements not included in ¶ 6—were false; yet the 180–day rule applies only to ¶ 6. Moreover ¶ 6(a)(xiv), excluded from the 180–day limit, represents that there had been no adverse change in Centennial's condition, "or any event or condition of any character, materially and adversely affecting the business or prospects of Centennial", since March 31, 1985. Astor contends that after March 31 Malchin threatened to leave, an adverse circumstance Runnfeldt did not reveal. Paragraph 8 accordingly does not bar this suit.

### B

■ Runnfeldt believes that it is not liable for securities fraud even if, as the jury found, Schoenberg and Goodman lied to Astor. Its principal argument is that the contract supersedes all prior oral statements. Because the contract does not contain any of the representations that Astor characterizes as false, Runnfeldt believes that it is in the clear—first because writings in general supersede oral representations, and second because of the integration clause in this contract.

Someone finding himself on the short end of a commercial transaction may believe sincerely that statements sometime during the negotiation misled him. Litigation risk in such cases is substantial, for memories differ, and it is hard to establish whose is correct. Add the possibility that a complainant will invent statements knowing that such claims are hard to disprove,

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 743–49, 95 S.Ct. 1917, 1929–32, 44 L.Ed.2d 539 (1975), and the rate of error in swearing contests is bound to be high. One of the principal achievements of the securities laws is to reduce risk by leading the parties to put representations in writing. We are therefore sympathetic to the contention that parties to securities transactions should be able to rely on the written word as the sole proof of the inducements behind the deal.

■ Ours is not a case, however, in which the written documents disclosed the truth, and the plaintiff insists that oral statements contradicted the writings. The contract is silent about who controlled the customers, about promises to Malchin, about the drivers' program. A silent contract does not prevent action based on an antecedent lie. *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317 (7th Cir.1988). Runnfeldt provides us no reason to question our recent holding that failure to reaffirm a statement in writing does not block recovery when the oral statement was a material misrepresentation. *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1234 n. 5 (7th Cir.1988).

Runnfeldt submits, however, that although the contract omitted the truth, it did contain a clause blocking reliance on the spoken word. It cites two cases holding that when the buyer agrees that it has relied *exclusively* on the representations in the contract, claims that prior oral statements were fraudulent are precluded. *Jackvony v. RIHT Financial Corp.,* 873 F.2d 411, 416 (1st Cir.1989); *One–O–One Enterprises, Inc. v. Caruso,* 848 F.2d 1283, 1286–87 (D.C.Cir.1988).

Paragraph 10 of the contract reads (in full):

> *Entire Agreement.* This. Agreement constitutes the entire agreement between the parties, and may not be amended or supplemented except by written instrument executed by an authorized agent or officer of each of the parties hereto.

As integration clauses go, this is wimpy. It makes no reference to prior "representa-

tions" and does not purport to modify ¶ 8 of the contract, which says that "[a]ll representations and warranties of the parties shall survive the closing of the transactions contemplated hereby." Paragraph 8 is not limited to written representations. Paragraph 10 implements the parol evidence rule, saying that the *agreement* is no more than what the contract says, adding that it may be modified only in writing. Astor does not seek to recover on an *agreement* at variance with the terms of the contract. It says, rather, that there was fraud in the inducement. Claims of fraud in the inducement are not blocked by the parol evidence rule. Paragraph 10 is a different animal from the clauses in *Jackvony* and *Caruso*, which recited that the buyer had performed its own investigation and was not relying on any representations other than those on paper. We conclude that the contract does not affect Astor's ability to recover for antecedent oral fraud.

### C

 Runnfeldt submits that the evidence is insufficient to support the verdict. Although phrased in several ways, the argument is fundamentally that Astor, sophisticated in the limo business, should have known better than to accept a lawyer's statement that he could deliver Centennial's customers. Had Astor but checked with Malchin, it would have learned the truth. Failure to take this precaution prevents Astor from recovering, Runnfeldt concludes.

This argument is cousin to the one we considered and rejected in *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir.1985): that a buyer's failure to investigate the statements made to it means that any reliance is unreasonable. The securities laws are designed to induce the person who possesses information to reveal it accurately. The obligation rests with the speaker, not with the listener. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.1977); *Rowe*, 850 F.2d at 1234. We observed in *Angelos* that securities fraud is an intentional tort, and that contributory negligence (= failure to investigate independently) is not a defense when the tort is intentional. It may be that Astor's failure to protect itself caused its loss, in the same way that failure to wear armor in the bathtub "caused" Agamemnon's death. Yet, as we held in *Angelos*, precautions are wasteful, and rules of law ought not induce buyers of securities to verify information that the sellers are supposed to provide. Securities laws are designed, in large part, to compel the person who knows firm-specific information to reveal it, and thereby eliminate wasteful duplication of effort in digging out facts. To say that a deceived buyer may not recover unless it has tried to verify the seller's statements would prevent the achievement of this objective.

Although, as many cases hold, "reliance" is an element of the plaintiff's case under Rule 10b–5, e.g., *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988), "reliance" in securities law is no more than the combination of a material misstatement (or omission) and causation. *Basic* proves the point by allowing a plaintiff to recover despite never having heard the lies. It was enough, the Court thought, that the misstatements were material, and that they affected the price at which the securities traded and thus caused a loss. Because reliance means only the conjunction of materiality and causation, we concluded in *Rowe*, 850 F.2d at 1233, that justifiable reliance is not an *independent* element in securities litigation. See also, e.g., *Angelos; Flamm v. Eberstadt*, 814 F.2d 1169, 1173 (7th Cir. 1987); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 202–03 & n. 24 (3d Cir. 1990).

 An alternative way to put the objection is to say (as Runnfeldt does) that its statements were such obvious hooey that no reasonable investor would have been taken in. In other words, the lies and omissions were not "material", because no reasonable investor would view them as altering the " 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (quoted in *Basic*, 485 U.S. at 232, 108 S.Ct. at 983).

An investor who has the truth in writing "is hard put to say that the inconsistent oral statement significantly altered the total mix of information." *Tenexco*, 844 F.2d at 1322. More, "an investor cannot close his eyes to a known risk." *Angelos*, 762 F.2d at 530; *Sundstrand*, 553 F.2d at 1044, 1048. This follows from the definition of materiality. No reasonable investor, knowing that statements are false or probably so, should consider the information important in determining whether to buy or sell. *Rowe*, 850 F.2d at 1233. Runnfeldt claims that Astor did just that. True, it asked who controlled the clients, and true, Runnfeldt lied. But Astor knew that dispatchers (and clients) are migratory; it knew that Malchin dealt with clients daily. Goodman and Schoenberg conclude that Astor could not have taken at face value their claim that they controlled the clients.

This was a fair argument to make to the jury. Runnfeldt took its crack. The jury sided with Astor, and it had sufficient reason to do so. Astor was dealing with a partner in Altheimer & Gray, its own law firm. A partner in the firm representing you on other matters is supposed to be a reliable source of information. Astor wanted to talk to Malchin, but Schoenberg denied it permission to do so until after the closing. So Astor's options were limited. It took the word of Schoenberg and Goodman—and took their word seriously enough to obtain no-competition clauses from *them* as opposed to Malchin. What was the point of getting a lawyer's promise not to compete in the limousine business unless Astor believed that Schoenberg controlled the clients? No information in Astor's possession indicated that Centennial's customers were any more fickle or had any more attachment to the dispatcher than normal. "[N]ot all information that may cast some doubt on a representation's reliability will automatically preclude materiality." *Rowe*, 850 F.2d at 1235. The jury was entitled to conclude that the statements were material.

### D

Astor complained about one misstatement (that Goodman and Schoenberg "con-trolled" the customers) and two omissions (that Malchin had been authorized to establish the drivers' program, diverting business from Centennial, and that Malchin had been promised a stake in the company). The jury was told that it could return a verdict for Astor on account of any one or more of these. The general verdict prevents us from learning which one or more of the claims it accepted. This is significant to Runnfeldt's next argument—that "judicial estoppel" prevents Astor from urging that Goodman and Schoenberg knew the two things they did not tell Astor before the sale.

When Centennial sued Malchin in state court, it insisted that Malchin lacked either an equity interest or authority to operate the drivers' program, and that Centennial had been unaware of an activity that it called a classic breach of fiduciary duty. Centennial *was* Goodman and Schoenberg, so if Centennial had not authorized and did not know about the drivers' program, Goodman and Schoenberg may not be mulcted for failure to reveal to Astor what they did not know. Runnfeldt believed that Astor's litigating position (through Centennial) in state court is so inconsistent with its position in federal court that it is estopped.

Judicial estoppel "precludes parties from abandoning positions taken in earlier litigation. *Himel v. Continental Illinois National Bank*, 596 F.2d 205, 210 (7th Cir. 1979). The principle is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." *Eagle Foundation, Inc. v. Dole*, 813 F.2d 798, 810 (7th Cir.1987). See also, e.g., *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.1990); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990).

Sometimes courts justify the doctrine on the ground that it is an offense against the judicial system to take inconsistent positions. E.g., *Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir.1990); *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834

**1548**

F.2d 208, 212 (1st Cir.1987). Yet Fed.R. Civ.P. 8(e)(2) allows a party to take inconsistent positions in a single suit. Often a pleader cannot tell what the facts will show. Courts allow a pleading of the sort "I never borrowed the lawn mower, it was broken when I borrowed it, and I returned it in perfect condition" because pleadings precede discovery and trial. Until the last minute it may be hard to tell what the evidence will show, and inconsistent pleadings allow a party to preserve its options. Inconsistency is acceptable because, at the end of the day, only one of these positions can obtain, and the pleader is limited to a single recovery no matter how many different (and conflicting) theories it offers. See also *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (criminal defendant may offer inconsistent defenses).

Inconsistent positions in different suits are much harder to justify. By the time of Suit # 2, many of the factual and legal uncertainties will have been overcome. The disposition of Suit # 1 may have established one or more facts, and although issue preclusion (collateral estoppel) formally applies only to a fact established adversely to the party, the principle that the resolution in the first suit should be respected has more general application. Inconsistent positions in sequential suits not only multiply the number of decisions, undermining principles of finality, but also facilitate double recovery. Why should one be entitled to win the first suit by demonstrating A and the second suit by establishing *not-*A? One of these must be wrong; indeed, inconsistency probably demonstrates a violation of Fed.R.Civ.P. 11.

■ Applying judicial estoppel only if a party *prevails* in Suit # 1 on the basis of a position inconsistent with that latterly taken allows alternative pleadings, and permits a party to change position to conform with the evidence. After losing Suit # 1 on Theory # 1, it may have learned a lesson about what the facts show and the law supports; an "inconsistent" position in Suit # 2 then may be closer to the truth. Once the first decision establishes a fact or claim

in the litigant's favor, that should be as binding as if the decision had been adverse. One full and fair adjudication is enough in either event. We agree with those courts that limit judicial estoppel to taking a position inconsistent with one underlying a prior judgment. The offense is not taking inconsistent positions so much as it is *winning*, twice, on the basis of incompatible positions. *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1167 (4th Cir.1982); *Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 598 (6th Cir.1982). (The position of the Ninth Circuit is unclear. See *Milgard Tempering v. Salas Corp.*, 902 F.2d 703, 716 (9th Cir.1990); *Stevens Technical Services, Inc. v. SS Brooklyn*, 885 F.2d 584, 588–89 (9th Cir.1989).)

■ Astor (through Centennial) prevailed in its litigation against Malchin. It has prevailed again against Runnfeldt, on a theory Runnfeldt insists is the opposite of the one that carried the day in state court. Runnfeldt insists that Astor—which was in privity with Centennial and directed the state litigation—is "stuck with" the propositions that Malchin lacked an ownership interest and was not authorized to run the drivers' program. We agree, but only in part.

Centennial (and thus Astor) contended in state court that "Malchin did not possess any ownership interest in the capital stock of CENTENNIAL," and therefore was not entitled to take records or clients with him. It is consistent to say in state court that Malchin never *obtained* an ownership interest in Centennial and in federal court that Goodman and Schoenberg *promised* him one—a promise the non-fulfillment of which led to disastrous results for Centennial.

The *volte face* about the drivers' program is another thing entirely. Centennial argued in state court that it had not authorized and did not know about the drivers' program, and it recovered substantial damages as a result of Malchin's competition with Centennial. In federal court Astor insists that Goodman and Schoenberg knew about, indeed authorized, the drivers' program, and that their failure to convey this

information to Astor was fraud. Astor tries to make these look consistent by saying that Centennial's pleadings in state court meant only that Centennial had not authorized the *continuation* of the drivers' program after Astor obtained control, and that the managers Astor installed at Centennial did not know what Malchin was doing. This is not what Centennial told the state court, and it is at all events incoherent under corporate law. Astor bought the *stock* of Centennial. The corporation continued without change. If Centennial ever authorized the drivers' program, that authority continued until revoked. Replacement of one managerial team by another does not abrogate prior agreements and wipe out "the corporation's" knowledge of its employees' acts. In state court Centennial, the corporation, pleaded and proved that it had not authorized or known about the drivers' program. If all Centennial meant in state court was that *Astor*, as buyer of stock, did not know about the program, then it has no basis for relief against Malchin. The theory on which Centennial demanded and obtained relief against Malchin blocks it from obtaining relief against Runnfeldt.

■ Was the error in submitting this theory to the jury harmless? The jury's general verdicts prevent us from knowing what it relied on. Astor relegated the drivers' program to a secondary role at trial, placing most of its emphasis on the misrepresentations about the control of the clients. It is tempting to call the submission harmless. Yet arguments about the drivers' program influenced the computation of damages as well as the decision on liability. What is more, counsel for both sides were so uncivil toward each other and the court, and the argument ranged so far afield, that it is difficult to call any particular error harmless. The district judge allowed the name-calling and bickering to proceed without effective restraint, although the court would have been justified in holding counsel for both sides in contempt of court. A federal judge need not—and ought not—tolerate snarling adversaries and unwillingness to abide by the court's decisions. A new trial is neces-

sary—would be necessary to recompute damages, see Part IV, even if not for this reason. At the next trial the judge should remove from the case all questions concerning the drivers' program. The court also should prevent the style of advocacy that marred this trial and impairs our confidence in the verdict.

### III

Astor prevailed on its pendent claims under state law as well as on its securities claims. Although our discussion of § 10(b) and Rule 10b–5 largely carries over to the state-law contentions, there are two potential differences. First, although securities law does not require an investor to investigate, state law may. Second, there may be differences between state and federal law of judicial estoppel.

■ *Angelos* suggests that Illinois may require of investors more research than do the federal securities laws. We recently wrestled with the tension in Illinois law between the maxim that contributory negligence is no defense to fraud and the state's requirement that reliance be "reasonable" or "justifiable". *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035 (7th Cir.1990). We concluded that Illinois does not create a general duty of reasonable care by buyers, but that a buyer that ignores a known or obvious risk may not recover. 896 F.2d at 1042.

We resist the temptation to have another go at reconciling the Illinois cases. Nothing a federal court can do will remove the tension state courts have created. In brief, the evidence in this case did not require a jury to conclude that Astor ignored a known or obvious risk. Every business has some risks; risks in the limousine service business were not so great that it was foolish to accept Goodman's and Schoenberg's word. No facts known to Astor indicated that Centennial's clients were especially fickle or under the control of the dispatcher. Illinois does not require special inquiry into all risks. There is, for example, always a risk that a building has water damage. Yet in Illinois a buyer may rely

on the seller to disclose water damage unless he has seen *specific* evidence of the damage. Compare *Posner v. Davis*, 76 Ill. App.3d 638, 32 Ill.Dec. 186, 395 N.E.2d 133 (1st Dist.1979), with *Smith v. Ethell*, 144 Ill.App.3d 171, 98 Ill.Dec. 742, 494 N.E.2d 864 (4th Dist.1986). Just so with the general risk that clients will migrate.

■ Parties cannot rely on representations when they have "equal knowledge, or access thereto." *Luciani v. Bestor*, 106 Ill.App.3d 878, 884, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (3d Dist.1982). This does not help Runnfeldt, however, for two reasons. First, Illinois courts often say "equal access" when they mean "actual possession". In *Luciani*, for instance, plaintiffs knew that an important client would stop patronizing the business they were about to purchase. *Ibid.* See also *Broberg v. Mann*, 66 Ill.App.2d 134, 144, 213 N.E.2d 89, 92–93 (2d Dist.1965) (purchaser of land could not rely on misdescriptions of land's size when he had surveys in hand that precisely described land). Second, Astor *did* inquire about the clients and was told not to worry. In Illinois a liar may not lull the victim into a false sense of security and then say that the reliance was not justifiable. See *AMPAT*, 896 F.2d at 1041–43; *West v. Western Casualty & Surety Co.*, 846 F.2d 387, 394–95 (7th Cir. 1988); *Linington v. Strong*, 107 Ill. 295, 302–03 (1883); *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 166, 109 Ill.Dec. 541, 548, 510 N.E.2d 409, 416 (1st Dist.1986); *Carter v. Mueller*, 120 Ill. App.3d 314, 319, 75 Ill.Dec. 776, 781, 457 N.E.2d 1335, 1340 (1st Dist.1983). Astor did not stick its head in the sand. It inquired about the clients from the party most likely to know. The answers were neither equivocal, *Marino v. United Bank of Illinois, N.A.*, 137 Ill.App.3d 523, 527, 92 Ill.Dec. 204, 207, 484 N.E.2d 935, 938 (2d Dist.1985), nor so bizarre as to put a prudent person on inquiry. See *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 51, 28 Ill.Dec. 226, 234, 390 N.E.2d 393, 405 (1st Dist.1979) (seller's statement that business priced at $60,000 would produce $10,000 profit per month not so "inherently implausible" as to place vic-

tim on notice). Astor was entitled to rely on the answers to its pointed questions. *Citizens Savings & Loan Association v. Fisher*, 67 Ill.App.2d 315, 324, 214 N.E.2d 612, 616 (5th Dist.1966). In Illinois, one need not assume that his trading partners are lying. *Eisenberg v. Goldstein*, 29 Ill.2d 617, 621, 195 N.E.2d 184, 186 (1963); *Gilbey v. Hamlin*, 297 Ill. 258, 263, 130 N.E. 702, 703 (1921).

■ The second potential difference between the disposition of the federal securities claims and the state fraud claim lies in the doctrine of judicial estoppel. We applied federal law of estoppel to the claims based on federal substantive law, because 28 U.S.C. § 1738 does not apply. Section 1738 requires a federal court to give a state judgment the same effect it would have in state court. Judicial estoppel is not part of the law of judgments in Illinois so much as it is a rule of evidence or pleading. *Finley v. Kesling*, 105 Ill.App.3d 1, 8, 60 Ill.Dec. 874, 880–81, 433 N.E.2d 1112, 1118–19 (1st Dist.1982).

But what of the state claim? The Rules of Decision Act, 28 U.S.C. § 1652, requires federal courts to apply "[t]he laws of the several states ... as rules of decision in civil actions" to the extent no federal statute or rule governs. Does this require us to apply Illinois rules of judicial estoppel to the common law claim, on the ground that it is substantive, or do we treat judicial estoppel as wholly a matter of procedure, to be governed by the law of the court in which the case is pending? Several circuits have assumed that *Erie* requires application of the state rule. E.g., *Konstantinidis v. Chen*, 626 F.2d 933, 937–38 (D.C.Cir. 1980). Others apply the federal rule, relying on the "balancing test" of *Byrd v. Blue Ridge Rural Electric Cooperative*, 356 U.S. 525, 536–38, 78 S.Ct. 893, 900–01, 2 L.Ed.2d 953 (1958). E.g., *Allen*, 667 F.2d at 1167 n. 4; *Edwards*, 690 F.2d at 598 n. 4.

If the question "is judicial estoppel a rule of decision?" had been put to the drafters of the Rules of Decision Act in 1789, they would have answered: "No, it is a mode of process". See Paul M. Bator, Paul J. Mish-

kin, Daniel J. Meltzer, & David L. Shapiro, Hart & Wechsler's *The Federal Courts and the Federal System* 755 (1988). Federal courts then may apply their own procedural rules. The Supreme Court, though, has expanded § 1652 beyond the understanding of 1789, treating as rules of decision those procedural rules that are "outcome determinative". *Byrd*, 356 U.S. at 536–37, 78 S.Ct. at 900. This expansion makes the choice between state and federal law hard for a doctrine such as judicial estoppel, a hybrid between substance and process that on occasion affects the outcome. Mercifully, the parties have spared us the choice, by ignoring the potential effects of *Erie*. Both sides have treated judicial estoppel as a doctrine to be shaped by the court in which the case is pending. On that assumption we apply to Astor's claim under state law the same rule used for its securities claims, and obviously we reach the same result.

## IV

■ The jury found for Astor on each of the four counts submitted to it. The damages cumulate to $525,000, almost exactly what Astor wanted. Jurors must have believed that the judge would add the counts together and award the sum to Astor. Nothing else explains either the fact that the total is *exactly* $525,000 or the award of $6,534 on the state-law count, a sum with no colorable basis in the evidence. Yet damages under different counts do not cumulate—something the jury was never told. When the verdicts came in as they did, the judge should have instructed the jury that it must calculate damages independently on each theory. Instead the judge disbanded the jury. Only later did counsel ask the judge to make repairs, and by then it was too late. *Watts v. Laurent*, 774 F.2d 168, 175–81 (7th Cir.1985). The evident confusion would require a new trial on damages—and unlike the situation in *Watts* the trial cannot be limited to damages, because the elimination of § 12(2) and the drivers' program from the case require a new trial on the merits too.

■ Additional problems concerning damages lurk in this record. For example, the contract shows that Astor bought all of the stock in Centennial for $192,057.70. The remaining $85,590.45 went to the Goodman–Schoenberg partnership for its assets, the limousines. The federal securities laws do not provide a remedy for fraud in the sale of limousines. If Astor can show some misrepresentations concerning the value of the limousines, it may be able to recover under state law; it cannot use § 10(b) and Rule 10b–5 to obtain the difference between the contract and market price of used cars.

■ The federal securities laws allow victims of fraud to recover their actual loss—the difference between what they paid for the stock and what it was worth. *Pelletier v. Stuart–James Co., Inc.*, 863 F.2d 1550, 1557–58 (11th Cir.1989); *Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 301–02 (10th Cir.1987). Stock cannot be worth less than nothing. Hence the maximum recovery in the case of fraud influencing a purchase is the purchase price, a limit §§ 11 and 12 of the '33 Act make explicit and that § 28 of the '34 Act strongly implies. Astor's limit under federal law then is $192,057.70, plus pre-judgment interest.

Astor claims that it lost profits as well as its investment. Had Centennial's business been as represented, Astor contends, it would have earned $300,000 in profits. It seeks this amount (and the jury evidently awarded it under § 10(b)). Now there is something implausible in saying that the stock was worth $500,000 (the purchase price plus the $300,000 profit Astor thought it would realize). Why would Runnfeldt sell for so much less? Maybe Astor is double counting, including as "profit" the return of its initial investment. At all events, the statutes limit victims to "actual damage", which courts routinely understand to mean "out of pocket loss". *Levine v. Seilon, Inc.*, 439 F.2d 328 (2d Cir.1971) (Friendly, J.) (no benefit-of-bargain damages in securities law); *Pelletier*, 863 F.2d at 1557 (collecting cases); *Harris v. American Investment Co.*, 523 F.2d 220,

224–227 (8th Cir.1975) (collecting cases). "Out of pocket" loss does not include lost profits. *Madigan, Inc. v. Goodman,* 498 F.2d 233, 239 (7th Cir.1974); *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.1965); *Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 533 (10th Cir.1962). See also *Sigafus v. Porter,* 179 U.S. 116, 21 S.Ct. 34, 45 L.Ed. 113 (1900); *Chandler v. Andrews,* 192 F. 543 (2d Cir.1911), both interpreting "actual damage" in other statutes as limited to out-of-pocket loss. If Congress looked to the caselaw in 1933 and 1934, it found a restrictive meaning for the term it enacted. See *Keeler v. Fred T. Ley & Co.,* 65 F.2d 499 (1st Cir.1933); *"Restatement of Torts"* § 549 (1938).

Astor submits that *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), and *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), are to the contrary, but they are not. Although both allow the plaintiff to recover more than its economic loss, neither allows a plaintiff to recover more than the amount paid for the stock. In *Randall,* for example, the plaintiff recovered the entire purchase price despite the fact that he had obtained tax benefits on the transaction, so that recouping the purchase price left him with a windfall. Like the "collateral benefit" rule of tort law, cases such as *Affiliated Ute* and *Randall* require the defendant to disgorge the takings in order to make fraud unprofitable. Neither of these cases, nor any other of which we are aware, sets damages at more than the price.

Securities generally have no "bargain element"; the price is what they are worth. Astor believed that Centennial's securities were worth $192,057.70 if Centennial was as represented. What Astor lost was the time value of money—the ability to make a return on an investment—not the ability to run a limousine service. Prejudgment interest will make Astor whole for the power of its money to earn more money. If Astor wanted in addition the profits available in the limousine business, it could have bought itself another limousine company to replace the customers who fled with Mal-

chin. (In other words, this is not a "lost volume problem".)

*Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), holds that the securities laws apply to a transaction, such as this, in which someone buys an entire business by buying its stock. *Landreth* is a formal decision: the sale concerns the stock, not the assets, and the courts should not look through one to find the other. Formality works both ways. Astor bought stock, and is entitled to the remedy prescribed for fraud in the sale of stock. Having used *Landreth* as entrée to federal court, Astor may not turn around and say: "Ah, but this was *really* a sale of assets and customer lists, so I am entitled to the damages appropriate in asset transactions." One characterization of the transaction is plenty, and Astor must take the bitter with the sweet. Astor cast this as a securities transaction, and it gets the securities measure of damages.

State law may be another matter. In 1977 the American Law Institute announced that the victim of deceit is entitled to damages based on the benefit of the bargain it thought it was getting. *Restatement (2d) of Torts* § 549(2) (1977). Astor has not discussed state law, but our research indicates that Illinois follows the benefit of the bargain approach in asset cases. *Home Savings & Loan Ass'n of Joliet v. Schneider,* 108 Ill.2d 277, 283–84, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985); *Schwitters v. Springer,* 236 Ill. 271, 86 N.E. 102 (1908); *Posner v. Davis,* 76 Ill.App.3d 638, 644–45, 32 Ill.Dec. 186, 191, 395 N.E.2d 133, 138 (1st Dist.1979); *Four "S" Alliance, Inc. v. American National Bank & Trust Co. of Chicago,* 104 Ill. App.3d 636, 640, 60 Ill.Dec. 314, 317, 432 N.E.2d 1213, 1216 (1st Dist.1982). *Four "S"* appears to be in point. There defendant induced the victim to lease a gas station by overrepresenting the expected monthly sales. The appellate court approved an award of damages based on the difference between actual profits and those that would have occurred had sales been as brisk as represented. If Illinois employs the same measure of damages in securities

cases as in asset cases, Astor may be entitled to obtain lost profits under state law.

This does not mean that Astor receives its purchase price *plus* lost profits. This would be double counting. *Four "S"*, for instance, awarded only lost profits. The state's formula is payment, minus value received, plus lost profits—or, as Illinois courts say, "the value the property would have had at the time of sale if the defects did not exist, less the value the property actually had at the time of sale due to the defects." *Posner*, 76 Ill.App.3d at 645, 32 Ill.Dec. at 191, 395 N.E.2d at 138. The parties will need to address on remand whether Illinois applies this measure in securities cases, and whether this measure ultimately differs from the one under § 10(b).

The judgment is vacated, and the case is remanded for proceedings consistent with this opinion.